STATE OF MAINE

KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-07-19
JMJ - KEN - 1/16/2008

JOHN T. CYR & SONS, INC.,

Petitioner

v.

STATE TAX ASSESSOR,

Respondent

**DECISION AND ORDER**

DONALD L. GARBRECHT
LAW LIBRARY

FEB 15 2008

Pursuant to M.R. Civ. P. 80C and 36 M.R.S.A. § 151, petitioner has petitioned this court for judicial review of the January 16, 2007 decision of respondent upholding a tax assessment against the petitioner. The parties have stipulated to the facts detailed below.

Petitioner is a Maine corporation doing business in Old Town, Maine. During all times relevant to this petition, petitioner operated as a school bus and motor coach transportation company. Between August 2001 and March 2004, petitioner purchased 26 motor coaches exempt from sales and use tax based on its belief that the coaches were qualified for exemption as "instrumentalities of interstate commerce." Accordingly, petitioner filed use tax exemption certificates for the coaches with Maine Revenue Services (MRS).

MRS conducted an audit of petitioner's sales and use taxes for the period between August 2001 and March 2004. As a result of the audit, MRS assessed use tax, interest, and penalties on 20 of the 26 coaches purchased during the audit period reasoning that the 20 coaches were not exempt "instrumentalities of interstate commerce." The assessment totaled $170,074.43 for use tax, $51,576.96 for interest, and penalties of $42,518.61.

Petitioner paid $83,220.00 for taxes assessed on 14 of the 20 coaches purchased between December 2003 and March 2004. The remaining 6 coaches[1], purchased between August 2001 and November 2003 are the coaches in dispute in this case. Petitioner requested reconsideration of the use tax assessment on the Buses pursuant to 36 M.R.S.A. § 151. The Assessor issued a decision upholding the assessment and applying the amount remitted by the petitioner to the amount due.

This court now evaluates this case based on petitioner's petition for judicial review of the Assessor's decision. The petitioner placed the buses in use in interstate commerce within 30 days of purchase. For a two-year period following placement of the buses in interstate commerce (Use Period), they were used to transport passengers across Maine state lines and to transport cruise ship passengers to and from points within Maine.[2]

During the Use Period, petitioner provided the buses on a periodic basis to an independent tour operator based in Florida (DCNE). DCNE provided tour operator services for tours offered to cruise ship passengers, called Shore Excursions. These Shore Excursions were offered to various cruise lines that sail ships into Bar Harbor and Portland, Maine from points outside of Maine. The Shore Excursions took place while the cruise ships remained in port. DCNE's services were provided to cruise lines pursuant to either written or verbal agreements. The contracts created by these agreements could be terminated by either the cruise line or DCNE.

Shore Excursions consisted primarily of day trips or tours in the Bar Harbor or Portland areas. They occurred from May to October each year and included but were not limited to bus tours of Acadia National Park and the City of Portland, schooner

---

[1] These coaches are identified in the audit as #470, #490, #500, #510, #580 and #610 (buses).
[2] Assuming only for the sake of clarity that the cruise passenger trips were not interstate commerce, the buses were not used 80% of the time or more for interstate commerce during the Use Period.

cruises of Casco Bay, and walking tours of Bar Harbor. DCNE exclusively provided tour guides for Shore Excursions with petitioner playing no role in conducting the tours.

Each Shore Excursion offering was determined by the cruise lines and developed by the cruise line in tandem with DCNE to be included in a brochure provided to cruise passengers by the cruise line. Production of the brochure was assisted by DCNE's obtaining of information such as the nature of the tour, the type of transportation to be used, duration of each tour, time allocations for each "leg" of the tour, physical requirements for each tour, and suggests on proper attire and footwear, depending on the nature of the tour.

Once a cruise line determined what Shore Excursion they would be offering to their passengers, they would contact DCNE to make appropriate arrangements for the Shore Excursions, including bus transportation. DCNE would then make a list of all Shore Excursions offered on a particular date and assign "allotments" for each tour. In assigning these allotments, DCNE would determine how many buses were available on that date for each tour and the minimum and maximum passenger capacity for each bus.

Each cruise passenger would, after booking a cruise and receiving a cabin number, be provided an invitation to register to participate in a Shore Excursion of their choosing depending on availability. Participation in Shore Excursions was optional, cruise passengers could register for Shore Excursions, opt to explore the port on their own, or stay aboard the cruise ship while in port. Shore Excursions were not offered to non-cruise ship passengers and the cruise ships could elect to not allow passengers the opportunity to participate in certain tours based on passengers' physical limitations.

Cruise passengers who opted to participate in Shore Excursions could register for a particular tour via the internet or by telephone and were required to pay for the tour immediately. The cruise lines were responsible for accepting and processing registrations and payments for the tours and determining the price to be paid by passengers for each Shore Excursion.

Approximately thirty days prior to each Shore Excursion, cruise lines would send DCNE confirmation of the number of registered passengers. If the minimum number of passengers were not booked for a particular tour, the cruise line could, at its discretion, cancel the tour. If the maximum capacity was reached for a particular tour and additional passengers were interested in participating, the cruise line could contact DCNE to request that capacity be expanded. DCNE could either grant or deny this request, depending on availability of bus transportation, economy, and demand.

Eighty percent of Shore Excursions are booked prior to passengers boarding the cruise ships. Passengers may book a Shore Excursion while onboard the cruise ship through the cruise line's Shore Excursion Department, subject to space availability, up to 72 hours before the cruise ship arrives at the designated port. Under certain circumstances, such as inclement weather conditions, a passenger could cancel a reservation for a Shore Excursion and receive a refund. Approximately 72 hours before a Shore Excursion is scheduled to occur, the cruise line would send DCNE a final "head count" for the particular tour. Regardless of whether passengers participated in a Shore Excursion they were required to re-board the cruise ship at the designated time of departure to resume their cruise.

During the Use Period, Cyr provided DCNE with bus transportation for Shore Excursions. There was never a written contract between DCNE and Cyr for provisions of bus transportation. Each year, DCNE provided Cyr with a written request for buses

for the Shore Excursions scheduled for that particular tour season. Cyr would then review the request and determine whether it could provide the requested number of buses for each date. If Cyr was unable to provide the number of buses requested, it would advise DCNE so that DCNE could make arrangements with other transportation providers, if necessary. DCNE was paid for tour operator services by the cruise line based on a previously negotiated and agreed upon rate. DCNE paid Cyr a rate per bus/per day, unilaterally set by Cyr, pursuant to monthly invoices prepared by Cyr to DCNE. Cyr never contracted with the cruise lines. Cyr does not nor did it ever have a written contract with DCNE. Cyr can at its sole discretion agree to or refuse to provide buses for DCNE. DCNE can cancel their trips any time with no ramifications by Cyr.

The question for this court is a narrow one, whether the Buses were used at least 80% of the time as instrumentalities of interstate commerce during the Use Period entitling them to an exemption from use taxation under § 1760(41).[3] More particularly, the question is whether use of the Buses were instrumentalities of interstate commerce when they were used for Shore Excursions.

In reviewing final determinations of the State Tax Assessor, the Superior Court shall review the case:

---

[3] 36 M.R.S.A. § 1760(41) provides:

The sale of a vehicle, railroad rolling stock, aircraft or watercraft that is placed in use by the purchaser as an instrumentality of interstate or foreign commerce within 30 days after that sale and that is used by the purchaser not less than 80% of the time for the next 2 years as an instrumentality of interstate or foreign commerce...For purposes of this subsection, property is "placed in use as an instrumentality of interstate or foreign commerce" by its carrying of, or providing the motive power for the carrying of, a bona fide payload in interstate or foreign commerce, or by being dispatched to a specific location at which it will be loaded upon arrival with, or will be used as motive power for the carrying of, a payload in interstate commerce. For purposes of this subsection, "bona fide payload" means a cargo of persons or property transported by a contract or common carrier for compensation that exceeds the direct cost of carrying that cargo or pursuant to a legal obligation to provide service as a public utility or a cargo of property transported in the reasonable conduct of the purchaser's own nontransportation business in interstate commerce.

> [I]n accordance with the Maine Administrative Procedures Act, except that Title 5, sections 1106 [power of the court to modify the record] and 1107 [manner and scope of review] do not apply. The Superior Court shall conduct a de novo hearing and make a de novo determination of the merits of the case. Either the taxpayer or the assessor may raise on appeal in Superior Court any facts, arguments or issues that relate to the assessor's decision on reconsideration, regardless of whether the facts, arguments or issues were raised during the reconsideration proceeding being appealed, provided that the facts, arguments or issues are not barred by any other provision of law. The court shall make its own determination as to all questions of fact or law, regardless of whether the questions of fact or law were raised during the reconsideration proceeding. The Superior Court shall enter such orders and decrees as the case may require. The burden of proof is on the taxpayer."

36 M.R.S.A. §151 (2007).

While the parties have stipulated to the facts it should be mentioned that the Superior Court does not act in its usual deferential (M.R. Civ. P. 80C/Maine Administrative Procedures Act) capacity when reviewing decisions of the tax assessor, "rather the Superior Court serves as the 'forum of origin for a determination of both facts and law' when reviewing decisions of the Assessor pursuant to 36 M.R.S.A. § 151." *Fairchild Semiconductor Corp. v. State Tax Assessor*, 1999 ME 170, ¶ 7, 740 A.2d 584, 586 (quoting *Enerquin Air, Inc. v. State Tax Assessor*, 670 A.2d 926, 928 (Me. 1996).

This is a question of statutory interpretation. "An exemption from taxation, while entitled to reasonable interpretation in accordance with its purpose, is not to be extended by application to situations not clearly coming within the scope of the exemption provisions." *Harold MacQuinn, Inc. v. Halperin*, 415 A.2d 818, 820. The reasonable interpretation of the plain meaning of the statutory language is essential and is done in the overall statutory context construing the language in light of the subject matter, purpose of the statute, and consequences of a particular interpretation avoiding absurd and illogical results. *Daimler Chrysler Corp. v. Executive Dir., Maine Revenue Services*, 2007 ME 62, ¶ 9, 922 A.2d 465, 469.

This court is not, however, working only from the text of the statute. The statutory language, particularly what the legislature meant by "instrumentality in interstate commerce," has been given meaning by the Law Court's interpretation of 36 M.R.S.A. 1760(41) in *Brent Leasing Co., Inc. v. State Tax Assessor*, 2001 ME 90, 773 A.2d 457. Particularly, the Law Court found that the Maine Legislature did not use the phrase "interstate or foreign commerce" in a manner intended to be "coextensive with the commerce clause" instead it intended the language to have "a narrower meaning than the meaning in the Commerce Clause." *Id.* at ¶ 10, 773 A.2d at 460.

> Because of the purpose of the use tax, it is apparent that the Legislature intended that any exemptions from the tax be limited to those otherwise required by the federal constitution or other laws or those demanded by public policy concerns. Extending the exemption beyond that required by public policy, other statutes, or the federal constitution does not advance the purpose of the use tax.

*Id.* at ¶ 12, 773 A.2d at 461.

Further the Court observed that the Legislature was "aware that states are not prohibited from taxing instrumentalities of interstate and foreign commerce so long as the tax meets the requirements established by the Supreme Court." *Id.* at ¶ 13, 772 A.2d at 461. Accordingly, the Court held that "[b]ecause the Legislature was aware of the constitutional limitation, it enacted the section 1760(41) exemption to meet that limitation." *Id.* at ¶ 14, 772 A.2d at 461. Accordingly, the Court "construe[d] section 1760(41) exemption to apply to vessels *only* when the Commerce Clause requires an exemption from use tax." *Id.* (emphasis added). Further, "[b]ecause it is not apparent that the Legislature intended to broaden the scope of the exemption beyond what it was constitutionally required to exempt, we conclude that it intended the narrower reading." *Id.* at ¶ 15, 772 A.2d at 462.

This court's interpretation of 36 M.R.S.A. § 1760(41) is thus rigidly constrained.[4] The exemption for "instrumentalities of interstate commerce" applies only so far as is necessary to avoid constitutional violation of the commerce clause. The exemption applies only when assessment does not meet four factors, "(1) it can only be applied to an activity with a substantial nexus with the taxing state; (2) it must be fairly apportioned; (3) it cannot discriminate against interstate commerce; and (4) it must be fairly related to the services provided by the state." *Id.* at ¶ 13, n. 6, 773 A.2d at 461 (citing *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 249). Since assessment of the tax in this instance meets all four of the *Brady* factors, petitioner is not entitled to the exemption.

Petitioner does not set out to prove that a tax on it would violate the Commerce Clause, rather it attacks the majority opinion in *Brent Leasing* citing the dissent in that case, "[t]hat a use would be permitted by the United States Constitution does not mean that the Legislature imposed such a tax." *Id.* at ¶ 19, 773 A.2d at 462 (Dana, J., dissenting joined by Clifford, J.). While this is a reasonable interpretation of 36 M.R.S.A. § 1760(41), it is not the one that commanded the majority of votes. This court is not in the position to reverse the Law Court's decision in *Brent Leasing,* and thus is bound to ask the question whether application of the tax in this instance to petitioner would

---

[4] While there are factual distinctions in this case as compared to *Brent Leasing, Co.,* none of the distinctions militates in favor of this court interpreting the phrase "instrumentalities of interstate commerce" differently than the Law Court in *Brent Leasing, Co.* That this case deals with interstate rather than foreign commerce is inapposite. The Law Court's interpretation as well as the statute itself applies with equal weight to foreign and interstate commerce, and the *Brady* standards are specifically applicable to interstate commerce. *See Id.* at 13, n. 6, 773 A.2d at 461. The payload here, as opposed to *Brent Leasing, Co.,* originated outside of Maine. This would be relevant to interpretation of "instrumentalities of interstate commerce" and a meaningful distinction were this court not bound to limit the extension of 36 M.R.S.A. § 1760(41) to only those situations in which not doing so would result in a tax that violates the commerce clause. Finally, that *Brent Leasing, Co.* dealt with a vessel and this case deals with buses is a meaningless distinction for purposes of interpreting the breadth of the tax exemption. 36 M.R.S.A. § 1760(41) treats all of its listed modes of transportation similarly with respect to the determination whether they are instrumentalities of interstate commerce.

violate the Commerce Clause based on the United States Supreme Court's *Brady* factors outlined by the Maine Supreme Judicial Court in *Brent Leasing*. It does not.

The entry is

The decision of the Maine State Tax Assessor is AFFIRMED.


January 16, 2008

Justice Joseph Jabar

Date Filed __2/12/07__ _____Kennebec_____ Docket No. __AP-07-19__
                                County

Action ___Petition For Review___
                   80C

# J. JABAR

John T. Cyr & Sons, Inc.          vs.     State Tax Assessor

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Christine Burke Worthen, Esq.<br>Eaton Peabody<br>PO Box 1210, 80 Exchange St.<br>Bangor, ME 04402-1210<br>- Bernard J. Kubetz, Esq. | Kelly L. Turner, AAG<br>6 State House Station<br>Augusta, Maine 04333-0006 |

| Date of Entry | |
|---|---|
| 2/12/07 | Petition For Review, filed.  s/Worthen, Esq. |
| 3/15/07 | Letter entering appearance, filed. s/Turner, AAG **(no record to be filed)** |
| 3/23/07 | Summons to State Tax Assessor and Certified Mail Receipt (unsigned), filed. Certified Mail Receipt to Office of the Attorney General (unsigned), filed. |
| 4/17/07 | Joint Motion for an Order to Specify the Future Course of Proceedings, filed. s/Kubetz,  s/Worthen, Esq.  s/Turner, AAG<br>Proposed Order, filed. |
| 4/18/07 | Notification of Discovery Service, filed.  s/Turner, AAG<br>State Tax Assessor's First Request for Production of Documents; State Tax Assessor's First Set of Interrogatories to Petitioner, served on B. Kubetz, Esq. on 04/17/07. |
| 4/18/07 | ORDER SPECIFYING FUTURE COURSE OF PROCEEDINGS, Marden, J.<br>Discovery to close within 8 months of date of order.  Motions to be filed within 2 months of close of discovery.<br>Copies mailed to attys of record. |
| 5/21/07 | Notification of Discovery Service, filed.  s/Kubetz, Esq.<br>Petitioner's Answers to Interrogatories; Petitioner's Response to Respondent's First Request for Production of Documents, served on K. Turner, AAG on 05/18/07. |
| 5/31/07 | Notification of Discovery Service, filed.  s/Turner, AAG<br>State Tax Assessor's Second Request for Production of Documents; State Tax Assessor's Second Set of Interrogatories to Petitioner, served on B. Kubetz, Esq. on 05/30/07. |
| 6/28/07 | Notification of Discovery Service, filed. s/Kubetz, Esq.<br>Petitioner's Answer to Respondent's Second Set of Interrogatories and Request for Production of Documents served on Kelly Turner, AAG. on 6/26/07. |
| 7/20/07 | Notification of Discovery Service, filed.  s/Turner, AAG<br>Subpoena For Inspection, served on S. Sherry, Esq. on 7/17/07. |

| Date of Entry | Docket No. _____ |
|---|---|
| 8/13/07 | Notification Of Discovery Service, filed 7/31/07. Notice of Deposition of John T. Cyr & Sons, Inc.; Notice of Deposition of Destination Canada/New England, served on B. Kubetz, Esq. on 7/27/07. |
| 11/19/07 | Joint Stipulation of Facts, filed. s/Turner, AAG |
| 12/7/07 | TMC Scheduled for 12/19/07 at 10:15 a.m. Trailing list for 1/14/08 Copies mailed to attys. of record. |
| 12/18/07 | Petitioner's brief on Stipulated Facts, filed. s/Worthen, Esq. (12/14/0 State Tax Assessor's Brief on Stipulated Record, filed. s/Turner, AAG (12/14/07) |
| 12/27/07 | Petitioner's Response to Respondent's Brief on Stipulated Facts, filed. Worthen, Esq. |
| 12/28/07 | State Tax Assessor's Reply Brief on Stipulated Record, filed. s/Turner, |
| 1/16/08 | DECISION AND ORDER, Jabar, J. The decision of the Maine State Tax Assessor is AFFIRMED. Copies to attys. of record. Copies mailed to repositories |